RENDERED: JUNE 17, 2010
TO BE PUBLISHED

$\mathfrak{Supreme}$ $\mathfrak{Court}$ $\mathfrak{of}$ $\mathfrak{Kentucky}$

2008-SC-000915-MR

**FINAL**

**DATE** 7-8-10 *a. Hick*

RAY'MON JA'KEE ROGERS                                         APPELLANT

|  | ON APPEAL FROM HARDIN CIRCUIT COURT |
|---|---|
| V. | HONORABLE JANET P. COLEMAN, JUDGE |
|  | NO. 07-CR-00251 |

COMMONWEALTH OF KENTUCKY                                         APPELLEE

**OPINION OF THE COURT BY JUSTICE VENTERS**

**<u>AFFIRMING</u>**

Appellant, Ray'mon Rogers, appeals as a matter of right[1] from a

judgment entered upon a jury verdict convicting him of complicity to commit

murder, complicity to criminal attempt to commit murder, and two counts of

complicity to commit first-degree robbery. In accordance with the jury's

recommendation, he was sentenced to a total of forty years' imprisonment.

On appeal, Appellant presents the following arguments: (1) that the trial

court erred by refusing to allow him to question the venire panel during voir

dire regarding the difference between the burden of proof at a civil trial versus

a criminal trial; (2) that he was entitled to a directed verdict on both counts of

complicity to first-degree robbery; and (3) that he was entitled to a directed

---

[1] Ky. Const. §110(2)(b).

verdict on the charge of complicity to criminal attempt to commit murder. For the reasons explained below, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The evidence presented and viewed in the light most favorable to the Commonwealth established the following facts. In April 2007, Appellant had just turned eighteen. He frequently ran around with James Bryant in a Ford Crown Victoria owned by Bryant's wife. Appellant was well acquainted with murder victim Marcus Pratt, whom he had known since elementary school.

On the evening of April 20, 2007, Appellant borrowed the Crown Victoria and drove to New Albany, Indiana, to pick up Pratt and attempted-murder victim James Hollister. Hollister testified he saw Pratt had about $800.00 to $1,000.00 in cash that night. The group left New Albany, crossed the bridge into Louisville, picked up two girls, and then went to a liquor store. Pratt paid for the liquor.

From there, they went to a residence where they found Bryant. Bryant joined Appellant, Pratt, Hollister, and the girls in the Crown Victoria. They stopped at another drive-thru liquor store. Pratt again paid for the liquor. Hollister noticed that Bryant watched Pratt getting out the cash, and thus knew that Bryant was aware that Pratt carried a large amount of money on his person. Then, they went to the girls' apartment where they drank alcohol and smoked marijuana. Hollister noticed Pratt had two cell phones with him.

After a while, Pratt told Appellant and Bryant that he and Hollister

wanted to go back to Indiana. Bryant responded there was one more stop to make, and they left the girls' apartment. After getting back into the vehicle, Pratt and Hollister fell asleep. Appellant initially drove, but because he was so intoxicated, Bryant took over the driving, and drove the car to Elizabethtown, with Hollister and Pratt asleep in the backseat.

Hollister testified he was awakened by the sounds of Appellant and Bryant outside the vehicle yelling at Pratt to give them "everything" he had. Bryant, seeing that Hollister had awakened, pulled him from the vehicle, and all four began to fight. Pratt tried to run and as he did, Appellant drew a gun and shot Pratt, killing him. In the meantime, Bryant severely beat Hollister into unconsciousness.

In the morning, Hollister woke up and tried to get help at nearby residences. His cell phone and money were missing. He eventually passed out. The next thing he remembered was awakening in the hospital, having suffered a broken nose and other injuries.

Neither of Pratt's two cell phones, and none of the cash that he had on his person the previous night was found on his body. In the days following the murder, Appellant was observed with a large amount of cash and a black cell phone he had not previously been known to have.

Police suspicion soon turned toward Appellant and Bryant. In an April 23, 2007, interview with Elizabethtown Police, Appellant admitted to being with Bryant the evening of April 20, 2007, but claimed that Bryant alone committed

all of the crimes. Appellant claimed to have been asleep when they arrived at Elizabethtown, and that he was awakened by shots outside the vehicle as Bryant murdered Pratt. Appellant claimed he then pretended to sleep while Bryant pulled Hollister from the vehicle and proceeded to beat him. He repeated this version of events at trial.

Appellant was indicted for complicity to murder, complicity to attempted murder, and two counts of complicity to first-degree robbery. The Commonwealth filed a notice that it would seek the death penalty, but later withdrew the notice. Bryant was similarly indicted, but was tried separately. Appellant was convicted of all charges. The jury recommended a total sentence of forty years' imprisonment. On November 10, 2008, the trial court issued a judgment and sentence consistent with the jury's recommendation. This appeal followed.

## II. THE TRIAL COURT PROPERLY LIMITED VOIR DIRE QUESTIONING REGARDING REASONABLE DOUBT

Appellant contends that the trial court erred by refusing to allow him to question the venire panel during voir dire regarding the difference between the burden of proof at a civil trial versus a criminal trial.

During voir dire, Appellant's counsel began to ask the venire panel if they knew the difference between a civil trial and a criminal trial with respect to the requirement of proof beyond a reasonable doubt. When the Commonwealth objected, trial counsel explained to the judge that he was trying to "let the jury

4

know" that a different standard of proof applied in criminal cases. Later in the same bench conference, counsel stated that he was trying to "educate the jury" to the fact that a different standard applied in a criminal case. The trial court sustained the Commonwealth's objection on the grounds that trial counsel was improperly attempting to define reasonable doubt. Although counsel was allowed to tell the panel that the burden in a criminal case is "beyond a reasonable doubt," he was not allowed to contrast that with a civil trial's "preponderance of the evidence" standard. The trial court concluded that explaining to the jury that belief beyond a reasonable doubt differed from belief by a preponderance of the evidence was tantamount to defining reasonable doubt, and would violate RCr 9.56. We affirm the trial court's exercise of discretion in limiting Appellant's counsel's statements to the jury, although we do so for slightly different reasons.

Trial courts are granted broad discretion and wide latitude in their control of the voir dire examination under RCr 9.38. "While it is within the discretion of the trial court to limit the scope of voir dire, that discretion is not boundless. Appellate review of such limitation is for abuse of discretion." *Hayes v. Commonwealth,* 175 S.W.3d 574, 583 (Ky. 2005) (citing *Webb v. Commonwealth,* 314 S.W.2d 543, 545 (Ky. 1958)).

We observe at the outset that under RCr 9.38, voir dire is an "examination of the prospective jurors" by which the court and counsel seek information *from* the prospective jurors. It is not an occasion for counsel to

5

educate the juror panel regarding legal concepts, although competent trial lawyers might properly structure their questions to the panel in a way that achieves that end. "The principal purpose of voir dire is to probe each prospective juror's state of mind and to . . . allow counsel to assess suspected bias or prejudice." *Lawson v. Commonwealth*, 53 S.W.3d 534, 539 (Ky. 2001) (quoting *Thomas v. Commonwealth*, 864 S.W.2d 252, 259 (Ky. 1993). Educating the jury on legal concepts is the function of the trial court. On that basis alone, we conclude the trial judge was well within the bounds of her discretion to limit counsel's attempt to use voir dire for the edification of the jury.

We also recognize, however, that in order to fairly exercise the right of peremptory challenges and challenges for cause, it is sometimes necessary to introduce legal concepts to the jury panel to ascertain if any prospective juror is unable or unwilling to adhere to the concept. For example, we have allowed trial counsel during voir dire to present limited information on the applicable sentencing options so that inquiry can be made into the ability of each prospective juror to consider the full range of punishment involved in the case. *Lawson*, 53 S.W.3d at 544. We recognize that concern for a juror's inclination to apply the reasonable doubt standard of proof may, in some cases, be a concern as serious as the juror's inclination to consider the full range of punishment.

RCr 9.56 states that the jury should not be instructed as to the definition

of "reasonable doubt." In *Commonwealth v. Callahan*, 675 S.W.2d 391, 393 (Ky. 1984), we extended the well-settled prohibition of defining reasonable doubt to all points in a trial's proceedings, stating "trial courts shall prohibit counsel from *any* definition of reasonable doubt at any point in the trial[.]" We have held that, subject to appropriate limits,[2] the rule is not offended by stating what reasonable doubt *is not. Id.* at 392.[3] In *Johnson v. Commonwealth*, 184 S.W.3d 544, 549 (Ky. 2005), we concluded that the prosecutor's statement to the jury panel that "beyond a reasonable doubt" was not the same thing as "beyond a shadow of a doubt" did not constitute defining of reasonable doubt. Most recently, in *Cuzick v. Commonwealth*, 276 S.W.3d 260, 268 (Ky. 2009) we declined to overrule *Johnson* on that very point[4] and expressly reaffirmed *Johnson's* point that "in the very case that announced the prohibition against defining reasonable doubt [*Callahan*], we held that the prosecutor's allegedly improper statement, which, at most, attempted to show what reasonable doubt was *not,* did not amount to a violation of the rule

---

[2] *Marsch v. Commonwealth,* 743 S.W.2d 830 (Ky. 1987) provides an example of such a limit. There, during voir dire the prosecutor engaged a prospective juror in a lengthy discussion of reasonable doubt that included the prosecutor's statement comparing reasonable doubt to a shadow of a doubt and to all doubt, and illustrating his comments with hypothetical examples of evidence that may represent the varying standards of proof. We found that RCr 9.56 had been violated.

[3] For example, in *Callahan,* 675 S.W.2d at 392, the prosecutor's remarks included: "When I went to college I had some teachers that could practically prove to you that we weren't even here today. But that's not what reasonable doubt is." We decided that the comments of the prosecutor did not constitute any attempt to define reasonable doubt, but rather what reasonable doubt was *not. Id.* at 393.

[4] In *Cuzick,* 276 S.W.3d 260, the decision was divided on other issues into three separate opinions, however the full court concurred on the point cited herein.

against defining 'reasonable doubt.'" *Cuzick*, 276 S.W.3d at 269 (citing *Johnson*, 184 S.W.3d at 549).[5]

As we noted above, the voir dire examination is to inform the court and trial counsel about the prospective jurors and not to educate the jury. But just as a juror's ability to consider the full range of penalties is frequently cause for legitimate concern, trial judges or trial counsel on both sides of a criminal case occasionally have reasonable concerns that prospective jurors may be confused or misinformed by the various standards of proof to which they have been exposed by prior jury service, news reports, television shows, or elsewhere, resulting in the inability or unwillingness of jurors to apply the reasonable doubt standard. The history of our cases on the subject plainly demonstrates such concern from the prosecutor's perspective, and we have consistently held their efforts to point out that reasonable doubt is not "all doubt" or a "shadow of a doubt" were either proper or were, at most, harmless error. Appellant argues that defense counsel with a similar concern should have the same opportunity to point out that the "beyond a reasonable doubt" standard required in a criminal case is not the same as the "preponderance of the evidence" standard applicable in most civil trials. We find no fault in that logic.

Accordingly, we agree that stating to the jury that "beyond a reasonable doubt" is not the same thing as the civil trial standard of "beyond a

---

[5] The fluid nature of this Court's view on this issue is revealed by comparison of *Johnson* and *Cuzick* with our decision in *Brooks v. Commonwealth*, 217 S.W.3d 219 (Ky. 2007), holding that the prosecutor's closing argument that beyond a reasonable doubt did not mean beyond all doubt was improper, but harmless.

8

preponderance of the evidence" does not constitute defining reasonable doubt.[6] In so holding, we remain consistent with our decisions in *Callahan, Johnson,* and *Cuzick.* Subject always to the trial court's sound discretion, such statements to the jury, if limited to the bare comment illustrated in the preceding sentence, are permissible during voir dire when used as the factual predicate for a question seeking to ascertain if any prospective juror would be unable to apply the reasonable doubt standard. Doing so does not violate RCr 9.56's prohibition against defining reasonable doubt, nor does it offend the principles set forth in *Taylor v. Kentucky,* 436 U.S. 478 (1978) or *Whorton v. Commonwealth,* 570 S.W.2d 627, 631 (Ky. 1978) (overruled on other grounds by *Kentucky v. Whorton,* 441 U.S. 786, (1979)), which led this Court to amend RCr 9.56 to its present form. Moreover, it accommodates the legitimate interest of all parties in a criminal case for assurance that jurors who cannot apply the reasonable doubt standard will be subject to challenge.

Appellant's counsel, however, never suggested to the trial court that he wanted to inquire if any juror would be unable to follow the criminal standard of proof beyond a reasonable doubt or would instead be inclined to apply the standard used in civil trials. Had he done so, the trial court's refusal to allow the inquiry would be subject to harmless error analysis. *Cuzick,* 276 S.W.3d at 267. Because our review of the record discloses that Appellant's sole purpose

---

[6] Theoretically, of course, it would be possible to completely define a thing by describing *all* that it is not. The limited comments described in *Callahan, Johnson* and *Cuzick* did not attempt define reasonable doubt by the process of eliminating all that it is not. We trust the sound discretion of our trial judges, guided by the limiting rule set forth herein, to be sufficient to restrain an improper attempt to define reasonable doubt.

in raising the matter during voir dire was to educate the jury, rather than to elicit potentially disqualifying information about the jury, we conclude that the trial court did not err when it terminated counsel's discussion of the issue.

### III.  APPELLANT WAS NOT ENTITLED TO A DIRECTED VERDICT ON THE COMPLICITY TO ATTEMPTED MURDER CHARGE

Appellant next contends that he was entitled to a directed verdict on the complicity to attempted murder charge.  He argues that the Commonwealth, at best, merely proved that he was present at the scene, and that his mere presence is insufficient to establish complicity in the attempted murder of Hollister.  He also alleges that the Commonwealth did not prove there was any intent to kill Hollister, or that Appellant aided and assisted Bryant in Hollister's beating.  To properly assess his claim, we must consider both the meaning of complicity, KRS 502.020, and the meaning of criminal attempt, KRS 506.010.

In considering a motion for a directed verdict, the trial court is required to draw all fair and reasonable inferences from the evidence in favor of the Commonwealth.  *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).

> [I]f the evidence is sufficient to induce reasonable juror to believe beyond reasonable doubt that defendant is guilty, directed verdict should not be given; for purpose of ruling on motion, trial court must assume that evidence for Commonwealth is true, but reserving to jury questions as to credibility and weight to be given to such testimony.
>
> On appellate review, test of directed verdict is, if under evidence as whole, it would be clearly unreasonable for jury to find guilt, only then defendant is entitled to directed verdict of acquittal . . . there must be evidence of substance, and the trial court is expressly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence.

10

*Id.* (internal citations omitted).

> The criminal complicity statute, KRS 502.020,[7] "describes two separate and distinct theories under which a person can be found guilty by complicity, i.e., 'complicity to the act' under subsection (1) of the statute, which applies when the principal actor's *conduct* constitutes the criminal offense, and 'complicity to the result' under subsection (2) of the statute, which applies when the *result* of the principal's conduct constitutes the criminal offense[.]"

*Tharp v. Commonwealth*, 40 S.W.3d 356, 360 (Ky. 2000).

The primary distinction between these two statutory theories of accomplice liability is that a person can be guilty of "complicity to the act" under KRS 502.020(1) only if he/she possesses the *intent* that the principal actor commit the criminal act. However, a person can be guilty of "complicity to the result" under KRS 502.020(2) without the intent that the principal's act cause the criminal result, but with a state of mind which equates with "the kind of culpability with respect to the result that is sufficient for the

---

[7] KRS 502.020 provides as follows:

(1) A person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he:

    (a) Solicits, commands, or engages in a conspiracy with such other person to commit the offense; or

    (b) Aids, counsels, or attempts to aid such person in planning or committing the offense; or

    (c) Having a legal duty to prevent the commission of the offense, fails to make a proper effort to do so.

(2) When causing a particular result is an element of an offense, a person who acts with the kind of culpability with respect to the result that is sufficient for the commission of the offense is guilty of that offense when he:

    (a) Solicits or engages in a conspiracy with another person to engage in the conduct causing such result; or

    (b) Aids, counsels, or attempts to aid another person in planning, or engaging in the conduct causing such result; or

    (c) Having a legal duty to prevent the conduct causing the result, fails to make a proper effort to do so.

11

commission of the offense," whether intent, recklessness, wantonness, or aggravated wantonness. KRS 502.020 (1974 Official Commentary); R. Lawson and W. Fortune, Kentucky Criminal Law § 3-3(b)(3), at 106, § 3-3(c)(2), at 114 (LEXIS 1998).

Conspiracy, as envisioned by the statute governing complicity, does not necessarily require detailed planning and a concomitant lengthy passage of time. All that is required is that defendants agree to act in concert to achieve a particular objective and that at least one of them commit that objective. *Commonwealth v. Wolford*, 4 S.W.3d 534, 540 (Ky. 1999). "The existence of a conspiracy can be proven . . . by circumstantial evidence." *Id.* However, absent a showing of other facts and circumstances connecting a defendant with the crime, mere presence at the scene of the crime is not sufficient to attach guilt to defendant. *McIntosh v. Commonwealth*, 582 S.W.2d 54, 57 (Ky. App. 1979) (abrogated on other grounds by *Commonwealth v. Clemons*, 734 S.W.2d 459 (Ky. 1987)).

Appellant's claim that he was "merely present" at the scene of the crime bears no resemblance to the evidence, when viewed most favorably to the Commonwealth. Hollister testified that when he awoke at the crime scene, Appellant and Bryant were together outside the vehicle accosting Pratt and demanding that he give them "everything he had," which would include Pratt's large sum of money. This strongly suggests that Appellant and Bryant were acting in concert to steal Pratt's money. When they realized that Hollister was

12

awake, Bryant immediately attacked him, and the scuffle ensued – Appellant and Bryant against Pratt and Hollister. Again, this suggests that Appellant and Bryant were allied in their conduct. Then, while Bryant kept Hollister occupied, Appellant shot Pratt, further indicating that Appellant and Bryant were complicit in each other's crimes.

In summary, there was sufficient evidence that Appellant aided or conspired with Bryant so as to present a jury issue regarding accomplice liability under the complicity statute.

Appellant argues, however, that even if he was found to be complicit in Bryant's crime against Hollister, there was insufficient evidence to show that Bryant's beating of Hollister constituted an attempt to kill him.

KRS 506.010, the criminal attempt statute, provides as follows:

(1) A person is guilty of criminal attempt to commit a crime when, acting with the kind of culpability otherwise required for commission of the crime, he:

> (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or

> (b) Intentionally does or omits to do anything which, under the circumstances as he believes them to be, is a substantial step in a course of conduct planned to culminate in his commission of the crime.

(2) Conduct shall not be held to constitute a substantial step under subsection (1)(b) unless it is an act or omission which leaves no reasonable doubt as to the defendant's intention to commit the crime which he is charged with attempting.

(3) A person is guilty of criminal attempt to commit a crime when he engages in conduct intended to aid another person to commit

13

that crime, although the crime is not committed or attempted by the other person, provided that his conduct would establish complicity under KRS 502.020 if the crime were committed by the other person.

Thus, in addition to the evidence of complicit acts described above in this section, the Commonwealth was obligated to present sufficient evidence that in beating Hollister, Bryant intended to cause Hollister's death. The Commonwealth may prove intent by circumstantial evidence. *Varble v. Commonwealth*, 125 S.W.3d 246, 254-55 (Ky. 2004); *Blades v. Commonwealth*, 957 S.W.2d 246, 250 (Ky. 1997). Circumstantial evidence is evidence that makes the existence of a relevant fact "more likely than not." *Timmons v. Commonwealth*, 555 S.W.2d 234, 237-38 (Ky. 1977). Although circumstantial evidence "must do more than point the finger of suspicion," *Davis v. Commonwealth*, 795 S.W.2d 942, 945 (Ky. 1990), the Commonwealth need not "rule out every hypothesis except guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307 (1979); *Ratliff v. Commonwealth*, 194 S.W.3d 258, 267 (Ky. 2006). A "[c]onviction can be premised on circumstantial evidence of such nature that, based on the whole case, it would not be clearly unreasonable for a jury to find guilt beyond a reasonable doubt." *Graves v. Commonwealth*, 17 S.W.3d 858, 862 (Ky. 2000).

While Appellant naturally tries to minimize the severity of the beating, the evidence demonstrates Hollister was beaten into unconsciousness and left at the scene unattended. Thus, a reasonable inference from the evidence is

14

that Appellant and Bryant, in addition to robbing Hollister, *also sought to eliminate him as a witness by killing him,* and when Hollister became unconscious, Appellant and Bryant thought they had accomplished their purpose and left him for dead. Even after regaining consciousness and seeking help the next morning, Hollister again lapsed into unconsciousness. While it appears that his most serious injury was a broken nose, Hollister testified that as a result of the beating he had scars on his forehead, the top of his head, and his arm, shoulder, and chest. The emergency room physician who examined Hollister testified that it required numerous CAT scans to evaluate his head injuries, the purpose of which was to look for possible intracranial bleeding and broken bones in Hollister's face and neck – injuries which could have been life-threatening.

We conclude that sufficient evidence was presented to support the conclusion that Bryant, with Appellant's aid and assistance, attempted to murder Hollister. Appellant was not entitled to a directed verdict on the charge of complicity to the attempted murder of Hollister.

## IV. APPELLANT WAS NOT ENTITLED TO A DIRECTED VERDICT ON THE COMPLICITY TO ROBBERY CHARGES

Finally, Appellant argues that he was entitled to a directed verdict on the two charges of complicity to first-degree robbery. With respect to the charged robbery of Pratt, Appellant argues there was no proof concerning what Pratt may have done with the money he had shortly before the shooting; that no one

15

saw anyone take or remove anything from Pratt; that Pratt still had crack cocaine in his pocket following his death; and that Appellant had only $35.00 on him when he was arrested.

With respect to the robbery charge against Hollister, Appellant argues that there was no evidence that he was complicit in taking anything from Hollister. While acknowledging that Hollister testified that his cell phone and money were missing following the beating, Appellant argues that his mere presence at the scene cannot support a conviction for the robbery.

To be convicted of robbery,[8] the accused need not have taken any money or other property from the victim with his own hands, or actually participated in any other act of force or violence; it is sufficient that he came and went with the robbers, was present when the robbery was committed, and acquiesced. *Commonwealth v. Smith*, 5 S.W.3d 126 (Ky. 1999) (quoting 67 Am.Jur.2d, Robbery § 9, p. 62).

There is substantial circumstantial evidence that Appellant and Bryant robbed Pratt and Hollister. Moments before the shooting of Pratt, Hollister heard Appellant and Bryant demanding that Pratt give them everything he had. When Pratt failed to comply, the fight ensued. When Pratt attempted to get away with his money and his life, he was killed. Hollister's money and cell

---

[8] The first-degree robbery statute, KRS 515.020, provides as follows:

(1) A person is guilty of robbery in the first degree when, in the course of committing theft, he uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft and when he:

    (a) Causes physical injury to any person who is not a participant in the crime; or

    (b) Is armed with a deadly weapon; or

    (c) Uses or threatens the immediate use of a dangerous instrument upon any person who is not a participant in the crime.

16

phone were taken while he was unconscious from the serious physical injury inflicted by Bryant and Appellant. The evidence that Appellant shot Pratt and that Bryant beat Hollister allows for a reasonable inference that the purpose of the use of such force was to accomplish the theft. As discussed in the previous section, the evidence supports the reasonable inference that Appellant was acting in complicity with Bryant so as to attribute to him conduct committed exclusively by Bryant. Appellant was not entitled to a directed verdict on the two robbery charges.

## V. CONCLUSION

For the foregoing reasons the judgment and sentence of the Hardin Circuit Court is affirmed.

Minton, C.J., Abramson, Noble and Schroder, JJ., concur. Scott, J., concurs by separate opinion in which Cunningham, J., joins.

SCOTT, J., CONCURRING: Although I concur in the result in this instance for reasons that the error here was harmless, I feel strongly that both Appellant and the Commonwealth do have a right to *educate* a jury on legal issues critical to a fair trial. That a "preponderance" is lower than "beyond a reasonable doubt" is such an issue, and pointing out simply which is lower does not define either one. If we are to retain our "bare bones" approach to instructions, rather than follow the federal practice, we must allow counsel this right.

Cunningham, J., joins.

17

COUNSEL FOR APPELLANT:

Susan Jackson Balliet
Assistant Public Advocate
Department of Public Advocacy
100 Fair Oaks Lane, Suite 302
Frankfort, Kentucky 40601

COUNSEL FOR APPELLEE:

Jack Conway
Attorney General

Todd Dryden Ferguson
Assistant Attorney General
Office of Attorney General
Criminal Appellate Division
1024 Capital Center Drive
Frankfort, Kentucky 40601-8204