RENDERED: JANUARY 6, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0253-MR

ANTHONY CORNIST												APPELLANT

v.							APPEAL FROM KENTON CIRCUIT COURT
HONORABLE PATRICIA M. SUMME, JUDGE
ACTION NO. 20-CR-00967-001

COMMONWEALTH OF KENTUCKY									APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CETRULO, JONES, AND McNEILL, JUDGES.

CETRULO, JUDGE: Appellant Anthony Cornist ("Cornist") appeals the order of

the Kenton Circuit Court denying his motion for directed verdict of acquittal and

asks this Court to reverse the jury verdict. We deny that request and affirm the

trial court.

# I.    FACTUAL AND PROCEDURAL HISTORY

A jury convicted Cornist of complicity to first-degree burglary; complicity to first-degree robbery; and, complicity to second-degree assault following the events of June 5, 2020. On that date, Cornist called his nephew, Robert Stone ("Co-Defendant Stone"),[1] to meet him at the Golden Towers apartment complex where Cornist lived. Once there, Cornist led Co-Defendant Stone and an unidentified woman to James Thompson's ("Thompson") apartment. Thompson also lived in the Golden Towers apartment complex and was an acquaintance of Cornist.

Upon arrival at Thompson's apartment, Cornist knocked on the door; then he and Co-Defendant Stone waited out of view of the peephole and the unidentified woman stood in clear view of the peephole. Once Thompson opened his apartment door, the woman walked calmly back to the elevator and held it open while Cornist and Co-Defendant Stone rushed into Thompson's apartment. Co-Defendant Stone then pushed Thompson back into the hallway and began beating him. Co-Defendant Stone beat Thompson to the ground, kicked him in the chest,[2] appeared to go through his pockets, and appeared to take something from around

---

[1] Cornist and Co-Defendant Stone were tried together, but Co-Defendant Stone is not a party to this appeal.

[2] Although the Commonwealth claimed that Co-Defendant Stone kicked Thompson in the face, Co-Defendant Stone testified that he had kicked him in the chest because the video showed his shoe below Thompson's chin.

his neck. The camera system of the apartment complex recorded these events from multiple angles.

At trial in December 2021, the property manager at Golden Towers ("Property Manager") testified about the security cameras of the apartment complex, and she explained that the videos did not contain audio. She further identified Cornist in the video as the man leading Co-Defendant Stone and the unidentified woman to Thompson's apartment, where Cornist pointed out Thompson's door to the group.

Next, Thompson testified. He corroborated what was depicted in the videos and stated that when he heard a knock on his door that night, he looked out the peephole and saw a woman he did not recognize. When he opened the door, Cornist and a man he did not know rushed in, there was a tussle, and he was pushed out into the hallway and beaten. He testified that he passed out briefly, and when he came to, he heard the men saying, "grab his TV" and "where's the money?" He also recounted that Co-Defendant Stone went through his pockets, but he could not remember if anything was taken.

Thompson also testified that he went to the hospital following the beating and was treated for a fractured orbital and broken arm, which later required permanent pins to be placed in his arm. He explained that, as of the day of trial –

18 months after the attack – he still had sharp pain in his arm and pain in his shoulder.

Following the Commonwealth's case-in-chief, Cornist moved for directed verdict of acquittal, arguing no rational juror could find he was guilty of complicity with Co-Defendant Stone's actions. Specifically, he claimed that there was no evidence that the charged crimes – burglary, robbery, and assault – even occurred and there was no indication that Cornist was involved or had conferred with Co-Defendant Stone prior to the events. Further, he argued that Co-Defendant Stone had pushed him, so he "could not be faulted" for entering the apartment, and he claimed Thompson's injuries did not constitute "serious physical injury" so second-degree assault did not apply.

In response to the motion, the Commonwealth recounted the video everyone had just watched, which showed Cornist leading the group into the elevator, to Thompson's floor, down the hallway to Thompson's apartment, and pointing out Thompson's door. It then showed him knocking on the door while hiding out of sight of the peephole. Once Thompson opened his door, the video showed Cornist rounding the corner toward the apartment. The Commonwealth argued that regardless of whether Co-Defendant Stone pushed Cornist into the apartment, Cornist was making his way into the apartment, so any alleged push simply would have gotten him there faster. Additionally, the Commonwealth

argued that the testimony of its witnesses provided adequate evidence that the crimes did occur, that Cornist was involved, and that Thompson's injuries constituted "serious physical injury."

The trial court agreed with the Commonwealth and noted that, according to the video, there appeared to be a preconceived plan: Cornist, Co-Defendant Stone, and the unidentified woman passed numerous other apartments to target a specific apartment (Thompson's), which Cornist pointed out. Additionally, they each appeared to have specific roles, with the female standing in view of the peephole then going to hold the elevator once the apartment door opened, and Cornist and Co-Defendant Stone appearing to hide from the peephole before rushing into the apartment.

After a detailed discussion of Thompson's testimony, which noted the entry into his apartment, his extensive injuries, the search of his pockets, and the discussions of other items to take, the trial court found that a rational juror could analyze the evidence provided and find the elements were met for each of the crimes charged. Therefore, the trial court denied Cornist's motion for directed verdict.

Next, Co-Defendant Stone testified, in pertinent part, that he met up with Cornist only because he called him in a frenzy, stating there was a problem. Co-Defendant Stone admitted that things got out of hand once they reached

Thompson's apartment, but that he had no intention of committing a crime when he went to Thompson's apartment. Lastly, he claimed he never reached inside Thompson's pockets. Cornist did not testify.

When the defense rested its case, Cornist renewed his motion for directed verdict, then-supplemented with the testimony of Co-Defendant Stone. The Commonwealth incorporated each of its previous responses to the motion and noted that testimony of Co-Defendant Stone did not negate the previous witnesses' testimony.

The trial court agreed and found the testimony of Co-Defendant Stone did not affect its earlier determination that a rational juror could find Cornist guilty of the crimes charged. Specifically, the trial court acknowledged that a jury could garner intent for the crimes from the circumstances surrounding the events, despite testimony of Co-Defendant Stone that he did not intend to commit any crimes.

The jury then convicted Cornist of complicity to first-degree burglary; complicity to first-degree robbery; and, complicity to second-degree assault. He appeals all convictions and argues the trial court erroneously denied his motion for directed verdict of acquittal.

## STANDARD OF REVIEW

This Court reviews the denial of a motion for directed verdict under an "any rational juror" standard, *i.e.*, we must determine whether any rational juror

could have found all the elements of the crime, "viewing the evidence in the light most favorable to the Commonwealth[.]" *Quisenberry v. Commonwealth*, 336 S.W.3d 19, 35 (Ky. 2011) (citing *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991) ("On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt[.]")). "For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony." *Benham*, 816 S.W.2d at 187.

## ANALYSIS

Cornist argues that the Commonwealth did not present sufficient evidence at trial to convict him of his three charges: (A) complicity to first-degree burglary; (B) complicity to first-degree robbery; and (C) complicity to second-degree assault. Therefore, he claims the trial court erred when it denied his motion for a directed verdict of acquittal. We will address each of his convictions in turn.

Importantly, each of Cornist's convictions were for complicity to crimes that Co-Defendant Stone committed, not for the commission of the crimes themselves. As such, it is valuable to first discuss what constitutes "complicity." Under KRS[3] 502.020, "Liability for conduct of another; complicity," a person is

---

[3] Kentucky Revised Statute.

guilty by complicity "when, with the intention of promoting or facilitating the commission of the offense" he or she "[s]olicits, commands, or engages in a conspiracy with such other person to commit the offense" or "[a]ids, counsels, or attempts to aid such person in planning or committing the offense[.]" KRS 502.020(1).

Cornist argues that the Commonwealth failed to prove that he intended to promote or facilitate the commission of a burglary, robbery, or assault on Thompson. However, the Kentucky Supreme Court has acknowledged that "[s]eldom is there direct evidence of a defendant's state of mind, but direct evidence is not required." *Quisenberry*, 336 S.W.3d at 36. In *Quisenberry*, the Kentucky Supreme Court – citing *Rogers v. Commonwealth*, 315 S.W.3d 303 (Ky. 2010) – reiterated that "state of mind – intent in that case – may be established by circumstantial evidence. That evidence includes the defendant's 'actions preceding and following the charged offense,' . . . as well as the defendant's knowledge and the surrounding circumstances." *Id.* (citations omitted). We will keep this complicity standard in mind as we address each of the charges.

### A. Complicity to First-Degree Burglary

Cornist argues that no rational juror could have found him to be complicit in the burglary because there was no "voluntary act on the part of Cornist that enables him to be liable for crossing the threshold through the doorway[,]"

because Co-Defendant Stone allegedly shoved him. However, as discussed, the standard for *complicity* is not whether the defendant committed the offense, but whether Cornist engaged in a conspiracy with Co-Defendant Stone to commit the offense or attempted to aid Co-Defendant Stone in planning or committing the offense.

> Pursuant to KRS 511.020(1)(b),
>
> [a] person is guilty of burglary in the first degree when, with the intent to commit a crime, he or she knowingly enters . . . a building, and when in effecting entry or while in the building or in the immediate flight therefrom, he or she or another participant in the crime:
>
>> (b) Causes physical injury to any person who is not a participant in the crime[.]

Here, the Commonwealth presented adequate evidence for a rational juror to find Cornist engaged in a conspiracy with Co-Defendant Stone or aided him in entering Thompson's apartment and beating him. The security video clearly showed Cornist leading Co-Defendant Stone to Thompson's door, pointing it out to Co-Defendant Stone (suggesting Co-Defendant Stone would not have known which door was Thompson's, otherwise), and hiding with Co-Defendant Stone before rushing into Thompson's apartment. Further, Thompson testified that Cornist held the door open while Co-Defendant Stone beat him and then stood beside Co-Defendant Stone as he continued to beat him and search his pockets.

-9-

Cornist argues that such evidence was not adequate because it failed to show that there was any agreement between Cornist and Co-Defendant Stone, or that there was prior knowledge that a criminal act would occur. However, as the Kentucky Supreme Court emphasized in *Quisenberry*, intent can be established by circumstantial evidence. *Quisenberry*, 336 S.W.3d at 36. That means the jury could reasonably rely on the security footage and Thompson's testimony to determine whether Cornist and Co-Defendant Stone had discussed a plan prior to going to Thompson's apartment. The almost-choreographed nature of the events provided evidence that reasonably could have been perceived as intent to commit the crimes. Therefore, the trial court did not err when it denied a directed verdict on this count.

### B.    Complicity to First-Degree Robbery

Under KRS 515.020(1)(a),

[a] person is guilty of robbery in the first degree when, in the course of committing theft, he or she uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft and when he or she: Causes physical injury to any person who is not a participant in the crime[.]

In *Quisenberry*, the Kentucky Supreme Court specifically addressed complicity to robbery: "With respect to robbery, moreover, we also noted in *Rogers* [*v. Commonwealth*, 315 S.W.3d 303 (Ky. 2010)] that to be convicted of that crime, 'the accused need not have taken any money or other property from the

victim with his own hands, or actually participated in any other act of force or violence; *it is sufficient that he came and went with the robbers, was present when the robbery was committed, and acquiesced*.'" *Quisenberry*, 336 S.W.3d at 36. (emphasis added) (citing *Commonwealth v. Smith*, 5 S.W.3d 126, 129 (Ky. 1999)).

There, unlike here, the evidence was entirely circumstantial. There had been no direct evidence that the defendant had been at the place of the crime and still, the Kentucky Supreme Court found that there was sufficient evidence to deny a motion for directed verdict. *Id.* at 37. Even more convincing, here, we have a video clearly depicting Cornist leading Co-Defendant Stone to Thompson's apartment, pointing it out, hiding until Thompson answered the door, rushing in, and watching as Co-Defendant Stone beat Thompson and appeared to take something. Further, Thompson testified that Cornist and Co-Defendant Stone asked where the money was and contemplated taking his TV after beating him.

In *Quisenberry*, specifically, the Kentucky Supreme Court concluded that from the circumstantial evidence presented – *i.e.*, phone records and testimony that the Co-Defendants had been together on the day of the robbery – a rational juror could have found that the complicit defendant

> was not a mere bystander at the robbery, but that he initiated contact with [the victim], that he shared with [the Co-Defendant] the purpose of [the crime], that he drove the pair to [the victim's] home, and, however the robbery may have commenced, acquiesced in it once it had, and assisted in the getaway.

-11-

*Id.* at 37.

Therefore, our Supreme Court found there was sufficient evidence of the defendant's complicity in the robbery and the trial court did not err. *Id.*

Here, the case is even more straightforward. The jury did not need to infer that Cornist initiated contact with the victim or Co-Defendant Stone, nor did it need to infer that Cornist took Co-Defendant Stone to the location of the crime or was present and acquiesced once the crime commenced, because it was on the security footage for the jury to watch first-hand.

Lastly, there was ample evidence that Thompson suffered physical injury in the course of the robbery. Aside from the video showing Co-Defendant Stone beating Thompson until he was hunched over on the floor and then kicking him in the chest, Thompson further testified that during the beating, Co-Defendant Stone fractured his orbital bone and broke his arm, both of which required medical attention.

Under these circumstances, a rational juror could have determined that Cornist engaged in a conspiracy with Co-Defendant Stone to commit the robbery or that he aided in its commission. As such, the trial court did not err when it denied Cornist's motion for directed verdict on this offense.

### C. Complicity to Second-Degree Assault

"A person is guilty of assault in the second degree when:

(a) He intentionally causes serious physical injury to another person[.]" KRS 508.020. KRS 500.080(17) defines "serious physical injury," in pertinent part, as "physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ."

Although Cornist acknowledges that the Commonwealth was not required to present medical testimony to prove "serious physical injury" – *McDaniel v. Commonwealth*, 415 S.W.3d 643, 660 (Ky. 2013) (citation omitted) – he argues that the Commonwealth needed to provide "a more exacting level of proof" than Thompson's testimony. Specifically, Cornist claims the Commonwealth "presented no evidence of Thompson's shoulder and arm pain, or how much time, if any, Thompson took to recover."

However, the Commonwealth argues that, at trial, approximately 18 months after the date of the events, Thompson testified that he still suffered pain in his shoulder and sharp pain in his arm as a result of the assault by Co-Defendant Stone's. Further, Thompson testified that he went to the hospital following the events and was treated for a fractured orbital and broken arm. To set the arm, Thompson had to have permanent pins placed in his arm. Thus, the Commonwealth claims there was sufficient evidence that Thompson suffered

-13-

prolonged pain, and therefore serious physical injury, from the assault by Co-Defendant Stone. We agree.

The Kentucky Supreme Court has held that pain is an impairment of health and "if it is prolonged, then it is a 'serious physical injury.'" *Parson v. Commonwealth*, 144 S.W.3d 775, 787 (Ky. 2004), *overruled on other grounds by Shields v. Commonwealth*, 647 S.W.3d 144 (Ky. 2022). In *Parson*, the defendant crashed his car into the victim's vehicle while driving under the influence. *Id.* at 777-78. There, the victim testified that she continued to suffer neck pain, muscle spasms, and numbness in her arm five months after the assault. *Id.* at 787. She also testified that she was suffering the effects of her injury at trial, which had occurred 19 months after the assault. *Id.* The Kentucky Supreme Court concluded that "[a] jury could also believe that [the victim] was still suffering from the effects of her injuries on the day of trial, nineteen months after the assault, and that the duration of those effects constituted a 'prolonged impairment of health.'" *Id.*

As the Commonwealth detailed, Thompson experienced similar prolonged pain, which had persisted to the date of trial, 18 months or so after the event. Similar to *Parson*, here, a jury could have believed that, at trial, Thompson was still suffering from the injuries from the assault and therefore had a prolonged impairment of health.

Moreover, a rational juror could have determined that Thompson sustained a serious physical injury and that Cornist engaged in a conspiracy with Co-Defendant Stone to commit the second-degree assault or that Cornist aided in its commission. Therefore, the trial court did not err when it denied Cornist's motion for directed verdict on this offense.

## CONCLUSION

Based on the evidence presented, viewed in a light most favorable to the Commonwealth, a rational juror could have determined that Cornist met the elements of complicity to first-degree burglary, complicity to first-degree robbery, and complicity to second-degree assault; therefore, the trial court did not err when it denied the motion for directed verdict of acquittal of Cornist on those counts. As such, we AFFIRM the trial court.

ALL CONCUR.

| BRIEF FOR APPELLANT: | BRIEF FOR APPELLEE: |
| --- | --- |
| Chase Cox | Daniel Cameron |
| Covington, Kentucky | Attorney General of Kentucky |
| | Robert Baldridge |
| | Assistant Attorney General |
| | Frankfort, Kentucky |